**MAX FACTOR & CO., a Delaware corporation, Plaintiff,**

**v.**

**Max FACTOR, individually and doing business as Max Factor Hosiery of Beverly Hills, Defendant.**

**No. 62–1660.**

United States District Court
S. D. California,
Central Division.

Sept. 17, 1963.

Gibson, Dunn & Crutcher, by John L. Endicott, Los Angeles, Cal., for plaintiff.

Jerome Weber and Bernard Mattison, Beverly Hills, Cal., for defendant.

CRARY, District Judge.

Plaintiff seeks judgment permanently enjoining defendant from use of the name "Max Factor" or any colorable imitation of plaintiff's trademarks "Max Factor" and "Max Factor of Hollywood" as a brand name or trademark for hosiery, or any product similar or related to the products of plaintiff, and for damages for trademark infringement and for unfair competition. Section 1114, Title 15 United States Code, concerns trademark infringement and provides, in substance, that to establish infringement one must prove, (1) use in commerce of a reproduction, copy or colorable imitation of the registered trademark involved, (2) that the use was without the consent of the registrant, (3) that it was in connection with the sale, offering for sale, distribution or advertising of goods, and (4) that such use was likely to cause confusion or mistake or to deceive;

or

the application of a reproduction, copy or colorable imitation of the trademark to labels, signs, packages, wrappers, or advertisements to be used in commerce or in connection with the sale, offering for sale, or advertising of goods in connection with which such use is likely to cause confusion, mistake or to deceive.

The plaintiff was incorporated in 1929 and succeeded a partnership in the business of the manufacture and sale of beauty parlor equipment, supplies, shampoo and theatrical make-up. Since 1929 plaintiff's business has expanded into general cosmetics, nail care, hand care, fragrances, and bath preparations, particularly for women, and plaintiff has, for many years, been engaged in the manufacture of cosmetics and other items connected with feminine beauty, which are widely distributed through drug stores, department stores, and other retail outlets throughout California, the United States and some one hundred thirty foreign countries, including London, England; Paris, France; and Rome, Italy. Sales, all at wholesale, from 1957 to 1962, in the United States totaled the approximate sum of $159,000,000.00. In the past five years plaintiff has spent about $31,000,000.00 on advertising in the United States, of which $4,000,000.00 was expended in 1962. Such advertising has been on television, in magazines and newspapers, and displays in windows, showcases, and on counters. Plaintiff has not and does not now manufacture or sell women's hosiery.

Defendant's true name since birth has been and now is Max Factor. He is the sole owner of a business known as "Max Factor of Beverly Hills." His place of business is located at 9015 Wilshire Boulevard in the City of Beverly Hills, California. The said business is limited solely to the sale of women's hosiery and was commenced July 1, 1961. Each pair of hosiery is enclosed in a transparent wrapper (plaintiff's Exhibit 3 and defendant's Exhibit A). Sale of the hose to the public is principally through drug stores. The hose have been displayed on racks, as shown by plaintiff's Exhibit 4, which racks are usually placed on counters or showcases in the retailer's place of business, sometimes next to or in close proximity of the products of plaintiff company.

The defendant has not and does not manufacture hosiery but merely receives a royalty on each pair of hose sold. He has a salesman in New York and a distributor in Chicago. All orders for hose are forwarded to a Mr. Sidney Kreiss in New York City with a copy of the order to defendant. Mr. Kreiss transmits the orders to the mills manufactur-

ing the hose and sends a copy of each order to the defendant's factor, Coleman & Company, who determines whether the credit of the purchaser is satisfactory. If credit is approved, the mill ships the hosiery direct to the customer with invoice and bill of lading and sends a copy of the invoice to Kreiss, Coleman and defendant. Invoices are prepared on the letterhead of Max Factor and are payable to Coleman & Company, who receives payment and transmits the entire amount, less its factoring charge, to the mill which remits the difference between its price to the defendant and the defendant's price to the customer. The factoring charge is borne by the mill and it prints the Max Factor name on the hosiery and, at its own cost, furnishes the cellophane bags and boxes bearing the Max Factor label.

Without further recitation of factual details from the record, suffice it to say the court concludes that all of the points required to establish infringement of the plaintiff's trademarks have been proven by more than sufficient evidence.

We now turn to the question of what effect, if any, does the fact defendant is using his *true name* in his business of selling hosiery, bear on his right to use his full name or surname in the circumstances here involved. Plaintiff cites several cases wherein parties whose use of their surname was held to infringe the trademark of another and injunction was ordered. In most of those cases the infringement concerned the same product sold by the registrant. These cases include International Silver Co. v. Rodgers Bros. Cutlery Co., (C.C.W.D.Mich.1905), 136 F. 1019; Hat Corporation of America v. Davis, (D.C.Conn.1933), 4 F.Supp. 613; De Nobili Cigar Co. v. Nobile Cigar Co., (1st Cir.1932) 56 F.2d 324; Wm. Rogers Mfg. Co. v. Rodgers & Spurr, (C.C.Mass.1882), 11 F. 495, 497–498; and Champion Spark Plug Company v. Champion, (D.C.E.D.Mich.1938) 23 F.Supp. 638.

In the case of Hat Corporation of America, supra, one Wm. H. Dobbs licensed the defendant company to use his name as a trade name and trademark in the manufacture and sale of hats on a royalty basis. The court held that the defendant had no right to use the name "Dobbs" in connection with the sale of hats in the circumstances and that the Wm. H. Dobbs himself had no right, as against plaintiff, to use the name Dobbs in connection with the sale of hats. Defendant claimed the right to use the name under an agreement with Wm. H. Dobbs. Said agreement for the use of the name did not transfer therewith any business. At page 619 of the opinion in 4 F.Supp. the court says:

"Does this mean that any man who has no business, but who happens to have a name which others have made valuable as a tradename, may license another to use the name in competition with the proprietor of a tradename? I think not. Such a holding, impliedly authorizing one to capitalize the nuisance value of his name, would be an invitation to blackmail and deception."

At page 620 of 4 F.Supp., the court goes on to say:

"* * * I am satisfied that at the time the 'license' was given, the licensor, Wm. H. Dobbs, as against the plaintiff, had no right himself to use his name as the defendant herein has subsequently used it. Thus by the license the defendant, as against the plaintiff, acquired exactly nothing.

"This conclusion depends upon the limitations which attach to a man's right to use his own name in his own business, a subject upon which there is much uncertainty in the law."

Thereafter the court discusses several cases, both English and American, on the question of a man's right to use his own name in his own business. The facts involved in each case discussed bear careful analysis.

It appears to this court that the ultimate question to be determined in each case is whether the defendant's use of

the trademark or trade name involved results in a false representation to the public whereby the public is likely to be deceived and whether the plaintiff would be subjected to the possibility of only inconsequential inconvenience or real damage. As stated by the court in Ramirez & Feraud Chile Co. v. Las Palmas Food Co., 146 F.Supp. 594, at page 605 (D.C. S.D.Cal.1956):

> "It is left to the courts to determine what conduct amounts to unfair competition in a particular case; the test question always is whether the public is likely to be deceived."

Citing numerous California cases, including MacSweeney Enterprises v. Tarantino, 106 Cal.App.2d 504, 235 P.2d 266, discussed hereinafter.

Referring again to the case of Hat Corporation of America, supra, the cases therein cited indicate that the relief to be granted is measured by the steps necessary to avoid confusion, which in some cases was accomplished by only the qualification of use of the surname with a prefix, suffix or explanation. At page 621 of the opinion of 4 F.Supp., the court states:

> "The extent to which a man may be precluded from the use of his name on account of its prior use by another has never been clearly defined by the Supreme Court."

In the discussion following, the court quotes from an opinion of Justice Holmes in the case of Waterman Co. v. Modern Pen Co., 235 U.S. 88, 35 S.Ct. 91, 59 L. Ed. 142, as follows:

> "But, whatever generality of expression there may have been in the earlier cases, it now is established that when the use of his own name upon his goods by a later competitor will and does lead the public to understand that those goods are the product of a concern already established and well known under that name, and when the profit of the confusion is known to and, if that be material, is intended by the later

man, the law will require him to take reasonable precautions to prevent the mistake."

It would follow that in each case where confusion has been established to the damage, of a party, the court would determine how far it would be necessary to go in the circumstances to alleviate the confusion. On this point, the court says:

> "But where the plaintiff's name is so associated with its product that the use of a surname on the defendant's goods will deceive the ordinary purchaser, such use of the name will be wholly enjoined even as against a corporate defendant deriving the name from one of its incorporators and stockholders." (Page 621 of 4 F.Supp.) (Citing cases.)

As to the use by defendant company of the name Wm. H. Dobbs, the court says, at page 622 of 4 F.Supp.:

> "The facts of the case at bar are such that Wm. H. Dobbs himself could not use the name 'Dobbs' in the marking of hats publicly offered for sale or in advertising hats for sale, without deceiving and confusing the public to the plaintiff's damage. That such deceit and damage have resulted from his operations as heretofore conducted in conjunction with Bert Pope, Inc., and the defendant, is only too clear on the evidence. More doubtful, perhaps, is the task of determining now whether any explanatory suffix to the name, such as 'not connected with the original Dobbs,' would suffice to avoid the confusion."

The court concludes in the case at bar that it is "only too clear" from the evidence that the use of the name "Max Factor" or "Lady Factor" by defendant confuses and deceives the public and that plaintiff has the right to have its trademarks protected. Now comes the question of what must necessarily be done, having in mind the facts and circumstances in this case, to preclude further confusion or deception on the part

of the public to plaintiff's damage. With this point in mind, it would be appropriate to examine the opinion written by Judge Learned Hand in S. C. Johnson & Son v. Johnson, 116 F.2d 427 (2 Cir.). In that case, the plaintiff, for many years, had manufactured and sold floor wax, varnishes, brushes, etc., but "never any sort of fabric cleaner." The plaintiff first registered the name "Johnson's" as a trademark in 1915. There were also subsequent registrations. Defendant started his business in 1932 under the name of "Johnson Products Company". The court said that at that time "it may be assumed that he did not then know of plaintiff's business." Defendant used the word "Johnson's" on his label with the word "Cleaner" below it in letters half the size. The court found that the defendant's use of the name caused confusion among plaintiff's customers. The plaintiff started to sell a cleaner for glazed surfaces but after the defendant commenced his business, so plaintiff was a newcomer in that particular market. The court said that the plaintiff could not stand on "the usual grievance in such cases; i. e. that the defendant in diverting its customers. It has no customers to divert, for it does not sell a cleaner for fabrics;". It is important to note, however, that the court held the plaintiff may protect itself against those who sell goods *near enough alike to confuse his customers.* (Emphasis ours.) At page 429 of 116 F.2d, the court says in this regard:

> "Therefore it invokes the doctrine that when a good will is established under the owner's name, given or assumed, he may protect it, not only against the competition of those who invade his market, but also against those who use the name to sell goods near enough alike to confuse his customers. We have often so decided, and it is not necessary to do more than refer to our last discussion." (Citing cases.)

The court goes on to say that where the injured party has not lost any sales the courts have based his rights on two other interests: "first, his reputation with his customers; second, his possible wish to expand his business into the disputed market." After commenting on these grounds as they applied to the facts in the Johnson case, Judge Hand states, at pages 429–430 of 116 F.2d:

> "It follows from what we have said that the newcomer will be subject to stricter limitations upon the use of his name when he is competing in the first user's own market, than if, as here, he has been the first to enter a new, though closely related, market.

> \*   \*   \*   \*   \*   \*

> *"what is a reasonable resolution of the conflicting interests in one case ordinarily will not be in the other; and it is obvious that no general principle is available and that the interests must always be weighed against each other."* (Emphasis ours.)

The court determined in the Johnson case that although defendant had not conducted its business as to disparage the plaintiff's name or injure its good will among those who might confuse the two, yet plaintiff was entitled to some measure of protection against the future for the reasons previously stated in the opinion, which are noted hereabove. The court suggested a judgment which required the defendant to use the name "Johnson" only in conjunction with the word "Cleaner" and to use such phrase in "immediate juxtaposition to the legend, 'made by the Johnson Products Company, Buffalo, N. Y.,' in type equally large and conspicuous." In the circumstances in that case, the court opined that to require the defendant to use "not connected with S. C. Johnson & Son Inc." was too severe. It was also of the opinion that if one "allows the good will of his business to become identified with a surname so common as Johnson, it is fair to impose upon him some of the risk that another Johnson may wish to sell goods not very far afield; and he must show a substantial interest if he would seriously impair the second Johnson's

privilege to use his own name in customary ways." (Page 430 of 116 F.2d)

In the Johnson case, defendant had no knowledge of plaintiff's business when defendant entered the related field, there was no intent, on the part of defendant, demonstrated to have its goods confused with the then goods of plaintiff or to sell his cleaner as the goods of plaintiff, and the trademark concerned involved a common surname. These points distinguish it substantially from the facts in the case at bar.

Relative to right to relief where the products being sold by a third person under a protected trademark or trade name are different from those of the owner of the mark or name, see also Aunt Jemima Co. v. Rigney & Co., 247 F. 407 at 409 (2 Cir.), and Yale Electric Corp. v. Robertson, 26 F.2d 972 at 973–974 (2 Cir.), where the court says:

"And so it has come to be recognized that, *unless the borrower's use is so foreign to the owner's as to insure against any identification of the two, it is unlawful.*" (Emphasis ours.)

For further discussion of the point, see Del Monte Special Food Co. v. California Packing Corp., 34 F.2d 774 at 775 (9 Cir.).

In considering what restrictions shall be placed on the defendant's use of the name "Max Factor" or the surname "Factor", attention should be given to the intent of the defendant in his use thereof re the sale of hosiery. Defendant started his business about July 1, 1962. He was notified by plaintiff of its objection to his use of the name Max Factor on hosiery or in connection with the advertising or sale thereof prior to the filing of the within action.

It appears from the statements of defendant, his agents or representatives, made to various persons in connection with the advertising and sale or offering to sell women's hosiery, that he was well aware of the operations of Max Factor of Hollywood and the good reputation that firm had built in the United States and elsewhere with respect to its products. The evidence discloses the defendant represented, in substance, (1) that his mother was a sister of the Max Factor in the cosmetic business and that he had his uncle's permission to use the name, whereas, the defendant is not, so far as he knows, related to the Factor family involved in the business of plaintiff herein; (2) that he was Max Factor, Jr., whereas, his father's name was Sam Factor; (3) that the defendant had the right to use his (defendant's) name on hosiery and that plaintiff could not interfere, whereas, at the time the temporary restraining order then in force in the case precluded the defendant from using the name "Max" with the name "Factor" in his business. It further appears that the defendant has used the name "Max Factor" as well as the phrase "Styled by Max Factor" on both hosiery and the cellophane bag and box in which he packaged same. The evidence also discloses that defendant's advertising and packaging refers to London, Rome and Paris, and his advertising bears a likeness as to plaintiff's use of the picture or sketch of the Eiffel Tower and the Coliseum in Rome (See defendant's Exhibits 8 and 22). Plaintiff, on a substantial portion of its advertising and packaging of its products, refers to Hollywood, London, Rome and Paris.

The evidence discloses that defendant's agents or salesmen of his distributor have represented in substance, (1) the "Max Factor people" had researched the quality of defendant's hosiery before they put it on the market and that the company was behind it though not marketing the hose themselves; (2) that defendant was licensed by the Max Factor cosmetics people to distribute hosiery, or were going to license defendant to use the name for that purpose; and (3) that defendant was a "separate division" of the cosmetic people, as well as other statements in advertisements leaving the inference that Max Factor hosiery was made by Max Factor the "beauty king", "the famous Max Factor" (pltf.'s Ex. 21), and "Max Factor of Hollywood" (Pltf.'s

Ex. 27). See also Exhibits 24, 25 and 26 re emphasis of "name", and pointing out that the name of "Max Factor" is synonymous with "beauty", and so forth. Exhibits 25 and 26 are communications dated in March and April, 1963, approximately fifty-nine in number, from one David P. Boies as Vice President of "Factor Hosiery, Inc." of Chicago, Illinois, to prospective purchasers of Max Factor hosiery.

■ The evidence, as outlined in brief above, clearly shows intent on the part of the defendant to obtain an unfair advantage and to use the name "Max Factor" for unfair competition and an intent to have defendant's hosiery confused with the goods of plaintiff. As stated by the District Court of Michigan in Champion Spark Plug Co. v. Champion, 23 F.Supp. 638 at 639–640:

> "The courts cannot interpret too broadly this right to use one's own name. That right must be interpreted as meaning a proper use. One can use his own name if by so doing he does not become guilty of unfair competition. The test to be applied to the right to use one's own name is the same as with reference to any other name. *The test to be applied under the law is, Was it unfair competition? Does it give to the public an article that they believe is manufactured by somebody other than the actual manufacturer?*" (Emphasis ours.)

■■ The intent to deceive in circumstances as found in the case at bar may be presumed by defendant's continued use of the name Max Factor after receipt of notice that the plaintiff objected thereto and that such use infringed plaintiff's trademark. It was so held in Robert Reis & Co. v. Herman B. Reiss, Inc., 63 N.Y.S.2d 786 at 790. The defendant is responsible for statements of his agents, exclusive distributors and their salesmen where he has put goods into the hands of said persons for sale to the public, which goods contain the means for deceiving purchasers, and it can be reasonably anticipated that they may be so used. Stewart Paint Mfg. Co. v. United Hardware Distributing Co., 253 F.2d 568 (8th Cir. 1958), and American Viscose Corp. v. Crown Craft, Inc., 28 F.Supp. 884 at 885 (S.D.N.Y.1939).

■ The courts have consistently recognized the need to protect the public interest in suits for trademark infringement and unfair competition as well as the interest of the owner. Fleischmann Distilling Corp. v. Maier Brewing Co., 314 F.2d 149 at 156 (9th Cir. 1963), and Stork Restaurant, Inc. v. Sahati, 166 F.2d 348 at 359 (9th Cir. 1948).

Plaintiff employed George Frye & Associates to make certain tests which were in the form of questions asked of specified women passing interview locations in Philadelphia, Detroit and Los Angeles on given dates in May and June, 1963. The interview locations were near the entrance to drug stores, Woolworth's and department stores where ladies' hosiery were sold in both urban and outlying districts in the cities involved. The results of the questions asked of each person interviewed and tabulation and report of over-all results of the tests are in evidence as plaintiff's Exhibits 13, 14, 15, 16, 18 and 19.

■■ The court concludes that plaintiff's trademarks, which plaintiff has used in the block letter form now employed since January 1, 1953, now have a secondary meaning as to the products of plaintiff and closely related products such as women's hosiery. It appears to the court that the defendant is selling the name Factor and masquerading under the trade name of plaintiff by giving the impression and leaving the inference that the hosiery are a product of Max Factor of Hollywood, whose reputation has been built over many years in the cosmetic field. It is obvious by reason of defendant's eagerness to use the name "Max Factor" or "Factor" in selling women's hosiery that it is the *name* that is making his project a success and that this is true only because so many women in the market for hosiery think that the

hose in question are the product of Max Factor of cosmetic fame. In the circumstances in the case at bar, as outlined above, it appears to the court that to avoid the confusion and deception, which the court finds exists in this case, the plaintiff is entitled to a permanent injunction precluding defendant's use of the name "Max Factor" or "Factor" in the sale of women's hosiery.

Although the surname of the defendant is here involved, it is the opinion of the court that he cannot use his own name in the sale of ladies' hosiery without inevitably representing the hosiery he sells as that of the plaintiff. As stated by the District Court of Appeal of the State of California in Hoyt Heater Co. v. Hoyt, 68 Cal.App.2d 523 at 527, 157 P.2d 657, at 659, in answering the question as to whether an injunction in that case precluding defendant to operate and advertise his business under his own name was too broad, "That one must use his own name honestly and not as a means of pirating the goodwill and reputation of a business rival; and where he cannot use his own name without inevitably representing his goods as those of another he may be enjoined from using his name in connection with his business." (Citing cases.) As stated by Judge Hincks in the Hat Corporation case, supra, at page 622 of his opinion in 4 F.Supp.:

> "And, obviously, halfway limitations inadequate to prevent confusion, propagate litigation, devastating uncertainty in business, and a cynical reaction to the administration of law. *Such results cannot be justified by a false tenderness for the rights of the individual.* To be sure, he is entitled to protection in all proper use of his name, but not to a use which, though true to the few fully informed, is false to the many who are only partially informed." (Emphasis added.)

Reference should also be made to the opinion in MacSweeney Enterprises v. Tarantino, 106 Cal.App.2d 504, 235 P.2d 266. In that case defendant was enjoined from using his surname "Tarantino" as a part of the label "Tarantino's Cocktail Sauce", which he used in the marketing of cocktail sauce which he manufactured. Plaintiff was the owner and operator of a well known San Francisco restaurant named "Tarantino's," located on Fisherman's Wharf. The defendant company was owned and operated by five members of the Tarantino family, several of whom were individual defendants. The defendant was engaged in packaging and marketing fish and manufacturing and distributing certain allied products which, except for the sauce involved, were sold under the trade name of "Tara Bell." The word "Tarantino's", used by defendant on its label, was in a form of script almost identical with that used by plaintiff to advertise its restaurant. The court there found that defendant deliberately adopted the name in an attempt to create the impression that its cocktail sauce was sponsored by plaintiff "and in order to capitalize on the good will and reputation" of plaintiff. At page 510 of its opinion, the court says [106 Cal.App.2d at page 510, 235 P.2d at page 270]:

> "The legal question presented is whether a person may use his own name to advertise his product when he resorts to deception intended to confuse the buying public and which inevitably would injure another rightfully using the name. We have no hesitancy in holding that such deceptive practices may be enjoined even though such injunction deprives a person from using his own name to advertise his product."

The most recent expression of a California Appellate Court on the matter here involved is the opinion in the case of Visser v. Macres, 214 A.C.A. 264, 29 Cal.Rptr. 367 (March 20, 1963). In that case, persons with the same name were involved and each was operating a florist business. Plaintiffs sought relief under the provisions of Section 3369 of the California Civil Code, which provides for injunctive relief in cases of unfair competition. The court states what it terms the "essential test" at page 270

of its opinion, as follows [214 A.C.A. at page 270, 29 Cal.Rptr. at page 370]:

"Accordingly, the courts have held that in determining what constitutes an unfair business practice, *the essential test is whether the public is likely to be deceived or confused* (Winfield v. Charles, supra, 77 Cal. App.2d 64, 71, 175 P.2d 69); that *a business practice may be unfair even though not inspired by a fraudulent intent*; and that *the subsequent use of a business name which previously has acquired a secondary meaning will be enjoined if a natural consequence of that use may be to deceive or confuse the public, even though no actual intent to defraud is present.*" (Emphasis added.)

Based on the foregoing analysis of the facts as found by the court in the case at bar and the authorities governing same, the court concludes that the defendant has infringed plaintiff's trademarks within the terms and provisions of Title 15 U.S.C. § 1114. The court further concludes that defendant's activities, as outlined hereinabove, constitute unfair competition and that plaintiff is entitled to injunctive relief as provided in paragraph 1 of its prayer.

If plaintiff desires to be heard on the matter of alleged damages its counsel should promptly make request for a hearing date, agreeable to defendant's counsel, from the court clerk. If damages are not sought, then plaintiff's counsel is requested to forthwith prepare Findings of Fact, Conclusions of Law and Judgment in accordance with the provisions of Rule 7 of the Local Rules of this court, West's Ann.Code, *except* that the Judgment shall be a separate document.

This memorandum opinion is not to be deemed a final Judgment.